*Chapter 9*

## CHILD PORNOGRAPHY PRODUCTION CASES

### A. BACKGROUND

This chapter presents an analysis of data concerning sentencing trends, offense conduct, offender characteristics, and victim characteristics in federal cases in which offenders were sentenced under USSG §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production) for producing child pornography ("production" cases or offenses).[1]  Sentencing in federal production cases has been less controversial than in non-production cases.[2]

The number of production cases has grown substantially since 1992, as reflected in Figure 9–1 below.  In 1992, there were only ten production cases.  During the past two decades, the number of cases has risen steadily, with the largest increase appearing after 2006 (from 92 cases in 2006 to 207 cases in 2010).  Even with this increase, production offenders constituted only 0.25 percent of the federal offender population in fiscal year 2010.  Figure 9–1 below also compares the annual increase in the number of production cases to the number of non-production cases — the latter divided into (1) receipt, transportation, and distribution ("R/T/D") cases and

---

[1]  The data are derived from two sources:  (1) routinely-collected federal sentencing data from the Commission's regular annual datafiles of fiscal years 1992 through 2010; in limited instances, relevant data from fiscal year 2011 also are noted; and (2) the Commission's special coding project of production cases from fiscal year 2010.  Fiscal year 1992 was selected as the starting point for data analysis in order to correspond to the Commission's data analysis of non-production cases.  *See* Chapter 6 at 121 n.2.  Relevant data in the Commission's regular datafiles include basic demographics, criminal history, guideline applications, sentences imposed, application of specific offense characteristics, and sentences relative to the guideline range.  Data in the special coding project supplement the annual datasets with more detailed information about offense conduct and offender characteristics.  Of the 207 production cases in fiscal year 2010, as many as ten were excluded from some of the data analyses that appear in this chapter because of insufficient sentencing documentation.  In some analyses, where relevant information from all 207 cases was available (*e.g.*, annual number of cases), all 207 cases were included.  The specific numbers of cases that were considered in each analysis are noted below in the figures.

[2]  *Cf.* Chapter 1 at 10–14 (discussing the criticisms of the non-production sentencing scheme).  A small number of courts have been expressly critical of the production guideline, USSG §2G2.1.  *See, e.g.*, United States v. Price, 2012 U.S. Dist. LEXIS 38397, at *33 (C.D. Ill. Mar. 21, 2012) (engaging in a variance from the guideline range recommended by application of §2G2.1, but observing that courts have been more critical of USSG §2G2.2 than of §2G2.1); United States v. Jacob, 631 F. Supp. 2d 1099, 1115 (N. D. Iowa 2009) ("USSG §2G2.1 has some of the same flaws that I found warranted categorical rejection of USSG §2G2.2 [*i.e.*, . . . it does] not distinguish between least and worst offenders . . . and [gives] excessive weight to some otherwise proper factors. . . .  Thus, I find that USSG §2G2.1 can be rejected on categorical, policy grounds.").  These courts appear to represent a minority of federal judges.  The Commission's 2010 survey of federal district judges revealed that the vast majority of judges surveyed stated that the guideline and statutory penalty ranges in production cases were appropriate as a general matter.  *See* U.S. SENT'G COMM'N, RESULTS OF SURVEY OF UNITED STATES DISTRICT JUDGES, JANUARY 2010 THROUGH MARCH 2010, Questions 1 and 8 (June 2012) (67% of judges responded that the mandatory minimum statutory penalties for production offenses were generally appropriate and 72% responded that the guideline ranges for production offenses were generally appropriate).  Nevertheless, as discussed below, in the past two years, the percentage of below range sentences has noticeably increased in production cases (albeit well below the equivalent rate in non-production cases).  *See infra* at 254.

*Exhibit A.*

(2) possession cases. In fiscal year 2010, production cases constituted 10.8 percent of all types of federal child pornography cases (207 of 1,924 cases).[3]



**Figure 9-1**
**Child Pornography Production Cases**
**Fiscal Years 1992-2010**

SOURCE: U.S. Sentencing Commission, 1992-2010 Datafile, USSCFY92-10

## B.    PENAL STATUTES AND GUIDELINE PROVISIONS CONCERNING PRODUCTION

It was not until the 1970s that significant efforts were made to combat the production of child pornography in the United States.[4] Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977, which was the first federal law outlawing the production of child pornography.[5] That penal statute had no mandatory minimum penalty and a maximum penalty of ten years of imprisonment.[6] Federal prosecutions for production offenses were rare

---

[3] Production cases occurred in all 12 federal circuits in fiscal year 2010. Because the annual volume of production cases is small and the number of cases brought in any particular district or circuit may differ significantly year by year based on the manner in which offenders are apprehended, an analysis of geographical distribution of production cases is not included in this chapter. *Compare* Chapter 6 at 127–29 (analysis of geographic distribution of the 1,654 non-production cases in fiscal year 2010). For instance, in fiscal year 2010, the District of Maryland, which had five production cases, was not among the top five districts in terms of the number of production cases. In fiscal year 2011, however, the District of Maryland had 15 production cases, which was the highest number among all 94 districts.

[4] *See* U.S. Dep't of Justice, FINAL REPORT OF THE ATTORNEY GENERAL'S COMMISSION ON PORNOGRAPHY 599 (1986) ("MEESE REPORT").

[5] Pub. L. No. 95–225, 92 Stat. 7 (Feb. 8, 1978) (codified as amended at 18 U.S.C. § 2251).

[6] *Id.*

during the next decade.[7]  Over the next two decades, Congress repeatedly increased the penalty range for production offenses, culminating with the PROTECT Act of 2003,[8] which created the 15-year mandatory minimum and 30-year statutory maximum penalties currently in effect.[9]  Defendants with predicate convictions for sex offenses are subject to increased minimum and maximum penalties.[10]

The sentencing guideline for production offenses is §2G2.1, which was part of the original 1987 guidelines.  Section 2G2.1 initially provided for a base offense level of 25 and had a single specific offense characteristic (a 2-level increase if a minor under the age of 12 years was used in the production).[11]  Over the years, the Commission increased the base offense level and added additional enhancements, usually as a result of congressional directives.  Section 2G2.1 has been amended 13 times since it became effective on November 1, 1987, with several amendments resulting in an increase in the minimum of the applicable guideline range.  For example, in 1996 the Commission implemented directives in the Sex Crimes Against Children Prevention Act of 1995[12] by increasing the base offense level in §2G2.1 from 25 to 27 and adding a 2-level increase if the offense involved the use of a computer.[13]  As another example, in 2004 the Commission implemented directives in the PROTECT Act by increasing the base offense level from 27 to 32, and by adding separate enhancements for offenses that involved the commission of a sexual act or contact, aggravated sexual abuse, or material portraying sadistic or masochistic conduct or other depictions of violence.[14]

The current production guideline, which went into effect on November 1, 2004, has a base offense level of 32 and six specific offense characteristics with various enhancements.[15]  Those enhancements are for:  (1) producing child pornography with minors under 16 or under 12 years of age (2- or 4-level enhancements); (2) engaging in certain types of "sexual conduct" or "sexual acts" with a minor, including sexual acts under aggravating circumstances such as an unconscious victim (2- or 4-level enhancements);[16] (3) distribution of child pornography (2-level

---

[7]  MEESE REPORT, *supra* note 4, at 604 ("The production of child pornography is so clandestine in character that from 1978 to 1984 only one person had been convicted under that portion of the 1977 Act."); *id.* at 606 (noting that there were "few indictments" under the federal production statute from 1984–86).

[8]  Pub. L. No. 108–21, § 103, 117 Stat. 650, 653 (2003).

[9]  *See* 18 U.S.C. § 2251(e).

[10]  *Id.* (defendants with one predicate conviction are subject to a 25- to 50-year range, and defendants with two predicate convictions face a range of 35 years to life imprisonment).  Production offenders with a predicate conviction for a sex offense involving a victim 16 years old or younger are subject to a mandatory sentence of life imprisonment without parole under 18 U.S.C. § 3559(e).  Predicate sex offenses are discussed in Chapter 2.  *See* Chapter 2 at 24.

[11]  USSC §2G2.1 (1987).

[12]  Pub. L. No. 104–71, §§ 2–3, 109 Stat. 774 (1995).

[13]  USSG App. C., amend. 537 (Nov. 1, 1996).

[14]  USSG App. C., amend. 664 (Nov. 1, 2004).

[15]  The current version of the production guideline is set forth in Appendix B.

[16]  The guideline defines "sexual act" as vaginal or anal intercourse with a minor victim of any age; penetration of the vagina or anus of a victim of any age with a finger or object; or sexual touching, other than through the clothing,

enhancement); (4) producing child pornography that depicts sadistic or masochistic conduct or violence (4-level enhancement); (5) using a minor who was a relative or otherwise in the care of the defendant (2-level enhancement); and (6) either misrepresenting the defendant's identity or using a computer for the purpose of enticing a minor or otherwise facilitating the offense (2-level enhancement).[17] In addition, the guideline provides that "[i]f the offense involved the exploitation of more than one minor," a court should apply the guidelines' multi-count rules in USSG §§3D1.1 through 3D1.5 "as if the exploitation of each minor had been contained in a separate count of conviction," even if the indictment only contained a single production count.[18] Thus, in a production case involving multiple victims, a defendant's base offense level could be increased even if he were convicted of only a single count of production.[19]

Under a cross reference provision in §2G2.2, the non-production guideline, a defendant who produced child pornography but who was only convicted of a non-production offense (such as possession or distribution) should be sentenced under §2G2.1 rather than under §2G2.2, if the former yields a higher sentencing range than the latter guideline.[20] In such a case, the statutory maximum punishment may be lower than the otherwise applicable guideline range.[21]

Only offenders sentenced under §2G2.1 as their "primary guideline" (*i.e.*, the guideline yielding the highest guideline range) are considered as "production" offenders in this chapter. Some offenders convicted of production of child pornography under section 2251 in fiscal year 2010 also were convicted of non-production offenses (*e.g.*, distribution of child pornography) and had higher guideline ranges under a non-production guideline, which became their primary guideline. In fiscal year 2010, 11 offenders convicted of production offenses had guidelines other than §2G2.1 as their primary guideline. Of those 11 offenders, ten were sentenced under

---

of the genitalia of a person under 16 years of age. It defines "sexual contact" as the sexual touching, whether or not through the clothing, of the victim's genitalia, anus, breasts, groin, inner thigh, or buttocks of a minor under 18 years old. *See* USSG §2G2.1, comment. (n.2) (incorporating the definitions set forth in 18 U.S.C. § 2256(2) & (3)).

[17] *See* USSG §2G2.1(b)(1)–(b)(6) (2011). Henceforth, in this chapter, all citations to §2G2.1 will be to the 2011 version unless otherwise noted.

[18] USSG §2G2.1(d)(1). The multi-count guidelines are USSG §§3D1.1 (Procedures for Determining Offense Level on Multiple Counts), 3D1.2 (Groups of Closely Related Counts), 3D1.3 (Offense Level Applicable to Each Group of Closely Related Counts), 3D1.4 (Determining the Combined Offense Level), and 3D1.5 (Determining the Total Punishment).

[19] *See, e.g.*, United States v. Peck, 496 F.3d 885, 890 (8th Cir. 2007) (noting that the defendant, who was convicted of a single count of production, received a 3-level increase in his offense level under USSG §2G2.1(d)(1) because of multiple victims in his case).

[20] USSG §2G2.2(c)(1).

[21] *See* subsection (a) of USSG §5G1.1 (Sentencing on a Single Count of Conviction) ("Where the statutorily authorized maximum sentence is less than the maximum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."). In 2010, in the case of a production offender convicted of a single count of possession, his guideline sentence under USSG §2G2.1 could be no more than 120 months, the statutory maximum penalty for possession then applicable (where the offender did not have a predicate conviction for a sex offense). *See* Chapter 2 at 26 & n.39. In the case of a production offender convicted of a single count of an R/T/D offense, his guideline sentence under §2G2.1 could be no more than 240 months, the statutory maximum penalty for an R/T/D offense (where the offender did not have a predicate conviction for a sex offense). *See id.*

the non-production guideline (§2G2.2) as their primary guideline.[22]  Because the non-production guideline was the primary guideline in their cases, those offenders are treated as "non-production" offenders and are analyzed in Chapters 7 and 8 along with other §2G2.2 offenders.[23]

The vast majority of offenders whose primary guideline was §2G2.1 (171 of 204, or 83.8%)[24] were convicted under 18 U.S.C. § 2251 for production offenses.  Of those 171 offenders, 162 were subject to mandatory minimum penalties of 15 years of imprisonment or more under the version of that statute in effect since the PROTECT Act, while eight were subject to a ten-year mandatory minimum under the version of the statute in effect immediately before the PROTECT Act went into effect.  One of the 171 offenders was convicted of an earlier version of section 2251 that did not carry a mandatory minimum penalty.  Eight of the 171 had one or more predicate sex convictions and received mandatory minimum penalties higher than 15 years; three of those eight offenders had predicate sex convictions involving minor victims under 17 years old and received sentences of life without parole under 18 U.S.C. § 3559(e).

Of the 33 offenders sentenced under §2G2.1 in fiscal year 2010 who were not convicted of production under section 2251, all were cross-referenced to the production guideline from another  guideline based on the court's finding that the offender produced child pornography in relation to his offense of conviction.  Those 33 included:

- four convicted of promoting (or conspiracy to promote) child prostitution;[25]

- six convicted of travel or enticement offenses;[26]

- 23 convicted of non-production child pornography offenses (ten of whom were convicted of possession and 13 of whom were convicted of R/T/D offenses).

---

[22]  The eleventh offender was convicted of obstruction of justice in connection with his successful destruction of sexual images that he had solicited from a minor and sentenced pursuant to USSG §§2J1.2 (Obstruction of Justice) (with a cross reference to 2X3.1 (Accessory After the Fact)) as the primary guideline.

[23]  As discussed in Chapter 7, 127 of the 1,654 offenders sentenced under the non-production guideline (USSG §2G2.2) in fiscal year 2010 committed production offenses in addition to their non-production offenses. *See* Chapter 7 at 181 (Table 7-1).  Six of those offenders had prior state or federal convictions for production that did not qualify as relevant conduct in their non-production prosecutions, and ten were contemporaneously convicted of a federal production offense along with their non-production offense.  The remaining 111 offenders were never convicted of their production offenses and were sentenced under §2G2.2 based on their convictions of non-production offenses.

[24]  Three of the 207 USSG §2G2.1 cases in fiscal year 2010 analyzed by the Commission did not have sufficient documentation to allow for analysis of the most serious offense of conviction.

[25]  *See* 18 U.S.C. § 1591.  One of those offenders was convicted of conspiracy to promote child prostitution under 18 U.S.C. § 371.

[26]  Travel and enticement offenses are discussed in Chapter 2. *See* Chapter 2 at 30.  One of those six offenses was a violation of 18 U.S.C. § 2425 (use of interstate facilities to transmit information about a minor).  An element of that offense is transmitting such information for purpose of enticing a minor under 16 years of age to engage in illegal sexual activity. *See* 18 U.S.C. § 2425.

Figure 9–2 shows the most serious offense of conviction for production cases sentenced under §2G2.1 in fiscal year 2010.[27]



**Figure 9-2**
**Production Cases: Most Serious Conviction**
**Fiscal Year 2010 (N=204)**

Child Prostitution
Related Offense
2.0%
N=4

Travel/Enticement
Offense
2.9%
N=6

Non-Production
CP Offense
11.3%
N=23

Note: Percentages may not sum to exactly 100% due to rounding. Of the 207 production cases in fiscal year 2010, three were excluded for insufficient documentation.
SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10.

### C.    ANALYSIS OF SENTENCING DATA

The following analysis of sentencing data in production cases generally does not extend beyond fiscal year 2010.[28] However, in two analyses — concerning (1) the rate of below range sentences and (2) the difference between the average bottom of the guideline range and average sentence — this chapter also notes data from fiscal year 2011 because significant changes

---

[27] Some production offenders were convicted of more than one type of sex offense (*e.g.*, a production offense and an enticement offense) or were convicted of a non-production sex offense (*e.g.*, distribution of child pornography) and were cross-referenced to USSG §2G2.1. Only the most serious offense of conviction per case is depicted in Figure 9–2. The order of seriousness, in descending order, is as follows: (1) production; (2) child prostitution related offenses; (3) travel/enticement offenses; and (4) non-production offenses. The order of the ranking is based on the severity of the statutory mandatory minimum and maximum sentences for offenders who have no predicate convictions for sex offenses. *See* 18 U.S.C. § 1591 (child prostitution/sex trafficking offenses, depending on the manner in which they are committed, have a range of punishment from a minimum of ten or 15 years to a maximum of life imprisonment); 18 U.S.C. § 2251 (child pornography production offenses have a range of punishment from 15 years to 30 years of imprisonment); 18 U.S.C. § 2422 (enticement offenses, depending the manner in which they are committed, have a range of punishment of zero to ten years or ten years to life imprisonment); 18 U.S.C. § 2423 (travel offenses have a general range of punishment of zero to 30 years of imprisonment, unless the victim is under 12, when a defendant is subject to a 30-year mandatory minimum penalty under 18 U.S.C. § 2241(c)). As discussed in Chapter 2, in 2010, the penalty ranges for non-production offenses were either zero to ten years of imprisonment (for possession offenses) or five to 20 years (for R/T/D offenses). *See* Chapter 2 at 25–26.

[28] Such analysis is consistent with the Commission's analyses of non-production cases in Chapter 6, which generally do not extend beyond fiscal year 2010 data. *See* Chapter 6 at 121, 152.

occurred during that one-year period.  All other data analyses do not extend beyond fiscal year 2010 data because there were no notable changes in fiscal year 2011 data.

During the past two decades, average sentences for production offenses consistently have been longer than average sentences for non-production offenses (both possession offenses and R/T/D offenses).  Average sentences consistently have increased over time for all types of child pornography offenses, as shown in Figure 9–3.

**Figure 9-3**
**Child Pornography Sentences Over Time**
**Fiscal Years 1992-2010**



Note  Average sentence length is shown as average total prison sentence excluding probation and months of alternative confinement
SOURCE  U.S. Sentencing Commission, 1992-2010 Datafile, USSCFY92-10.

Average prison sentences for production offenses increased from 63.5 months in 1992 to 153.4 months in 2004, the year after the PROTECT Act was enacted.  As more offenders thereafter were subject to the increased penalty provisions in the PROTECT Act, sentences continued to increase, and by 2009 average sentences hit their high point (282.9 months).  Average sentences decreased slightly in fiscal year 2010 (267.1 months).[29]

All production offenders sentenced in fiscal year 2010 received a term of imprisonment as part of their sentences.  This has been a relatively consistent trend since 1992, when 90 percent (9 of 10) received prison only sentences, and one offender received a sentence of probation.  By 2010, all production offenders received custodial sentences of prison only.[30]

---

[29]  The above reported average sentences for fiscal years 2009 and 2010 include a small number of cases in which offenders were sentenced under pre-PROTECT Act versions of the applicable sentencing guidelines and penal statutes (which increased in severity after the PROTECT Act went into effect).

[30]  By comparison, for all federal offenders in fiscal year 2010, the prison only rate was 87.4%, followed by much smaller rates for probation only (7.3%), probation with some form of community confinement (2.8%), and imprisonment and some other type of confinement (2.5%).

Figure 9–4 below shows sentences in production cases in relation to the applicable guideline ranges during the period of fiscal year 1992 through fiscal year 2010.[31] For production offenses, in 1992, 88.9 percent (8 of 9 cases) were sentenced within the range and 11.1 percent were sentenced above the range; none received below range sentences.[32] The within range rate fluctuated for several years, and by fiscal year 2004, 84.0 percent (79 of 94) of offenders were sentenced within their applicable guideline ranges, with small percentages of offenders receiving sentences above or below their ranges (including below the range based on substantial assistance to the authorities). Following *United States v. Booker*[33] and its progeny,[34] the within range rate steadily dropped, and, by fiscal year 2010, the within range rate for production cases was 56.8 percent (109 of 192 cases), while the below range rate (excluding substantial assistance departures) increased to 35.9 percent (69 of 192 cases). The within range rate continued to decrease in fiscal year 2011, when 50.4 percent (114 of 226) of offenders were sentenced within the applicable guideline range and 38.1 percent of offenders (86 of 226) received below range sentences for reasons other than substantial assistance. By comparison, in *non-production* cases in fiscal year 2011, the within range rate was 32.7 percent, while the below range rate (excluding substantial assistance departures) was 62.7 percent.[35]



**Figure 9-4**
**Within Range and Out of Range Sentences:**
**Production Offenses**
**Fiscal Years 1992-2010**

---

[31] Figure 9–3 uses a format that allows comparison of pre- and post-*Booker* cases; it shows within range sentences, cases in which offenders received downward departures under USSG §5K1.1 for substantial assistance, all other government and non-government sponsored below range sentences, and above range sentences.

[32] Relevant documentation concerning one of the ten production cases was missing. Thus, this data analysis is limited to the nine remaining cases. The incomplete documentation for that offender's case shows that he received probation.

[33] 543 U.S. 220 (2005).

[34] *See, e.g.*, Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007).

[35] *See* U.S. SENT'G COMM'N, SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 80 (2011) (Table 28).

While the within range rate in production cases has been steadily decreasing since *Booker*, average sentences in production cases continued to increase until fiscal year 2010, when they slightly decreased (as reflected in Figure 9–3 above).  The increase in average sentences, despite a decreasing rate of within range sentences since *Booker*, is explained by two trends:  (1) increasing average guideline minimums in the past few years (as reflected in Figure 9–6 below); and (2) the significant number of sentences in production cases (40.5% in fiscal year 2010) at or above the middle of the applicable guideline ranges (including upward departures or variances above the applicable ranges).[36]

Figure 9–5 below shows sentences within and outside the guideline range between fiscal years 2005 and 2010.  Beginning in fiscal year 2005, the Commission changed the manner in which it reported sentencing data in response to *Booker*.[37]  Since then, below range sentences are reported as (1) government sponsored below range sentences based on an offender's substantial assistance (pursuant to USSG §5K1.1 (Substantial Assistance to Authorities (Policy Statement)), (2) other government sponsored below range sentences, or (3) non-government sponsored below range sentences.  Both non-§5K1.1 government sponsored below range sentences and non-government sponsored below range sentences increased in production cases after *Booker*.  In fiscal year 2005, 3.7 percent of production offenders received a non-§5K1.1 government sponsored below range sentence, and 18.4 percent received a non-government sponsored below range sentence.  By fiscal year 2010, 12.0 percent of offenders received non-§5K1.1 government sponsored below range sentences, and 24.0 percent received non-government sponsored below range sentences.

Of the 200 fiscal year 2010 production cases for which sufficient documentation existed, courts downwardly varied or departed in 70 cases (35.0%) for reasons other than substantial assistance.  As reflected on the statement of reasons forms, the three primary reasons given by courts for varying or departing downwardly were:  (1) a variance based on the "nature and circumstances of the offense [and/or] the history



**Figure 9-5**
**Within Range and Out of Range Sentences:**
**Production Offenses**
**Fiscal Years 2005-2010**

---

[36]  Of the 200 production cases in fiscal year 2010 that included complete documentation, 81 (40.5%) involved sentences at the mid-point or higher of the applicable guideline ranges (including ten cases involving upward departures or variances above the applicable ranges).  Conversely, of all federal cases in fiscal year 2010 with complete documentation, 18.1% of cases involved sentences at the mid-point or higher of the ranges (including upward departures or variances).

[37]  This change took effect for cases sentenced since January 12, 2005, the date of the *Booker* decision.  As a result, fiscal year 2005 is reported as the partial year from January 12, 2005 through September 30, 2005.

and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1) (53.5%); (2) a departure[38] or variance based on the overrepresentation of a defendant's criminal history score (18.0%); and (3) a variance based on the defendant's mental or emotional conditions (18.0%).

Figure 9–6 below shows the average length of the term of imprisonment imposed compared to the average bottom of the applicable guideline range in production cases from fiscal years 1992 through 2010.  Also indicated are key periods:  the *Koon* era, the PROTECT Act period, the *Booker* era, and the *Gall* period.[39]  As Figure 9–6 demonstrates, average prison sentences in production cases largely tracked the average guideline minimums, with average sentences slightly above the average guideline minimums from 1996 through 2005, and very close to the average guideline minimums until fiscal year 2010, when the average sentence (267.1 months) fell slightly below the average guideline minimum (281.0 months).



**Figure 9-6**
**Average Guideline Minimum and Sentence Imposed:**
**Production Offenses**
**Fiscal Years 1992-2010**



Note: Average sentence length is shown as average total prison sentence excluding probation and months of alternative confinement.
SOURCE:  U.S. Sentencing Commission, 1992-2010 Datafile, USSCFY92-10.

In fiscal year 2011, the trend continued, with the gap between the average sentence and the average guideline minimum increasingly slightly.  In fiscal year 2011, the average guideline minimum was 291.0 months, while the average sentence imposed was 274.0 months.

Figure 9–6 should be contrasted with Figures 6–7 and 6–8 in Chapter 6, which show a more pronounced and growing gap between the average guideline minimum and average sentence imposed in non-production cases during the same time period.[40]

---

[38] *See* USSG §4A1.3(b).

[39] These periods (and the above-mentioned U.S. Supreme Court decisions and PROTECT Act upon which they are based) are discussed in Chapter 6.  *See* Chapter 6 at 123–24.

[40] *See id.* at 135.

In fiscal year 2010, in production cases in which a below-range sentence was imposed, the average extent of non-government sponsored downward departures and variances — as expressed in the difference in percentage between the average guideline minimum and average sentence imposed in cases receiving below-range sentences — was 24.5 percent (or an average reduction of 64 months); the average extent of government sponsored downward departures and variances (other than for an offender's substantial assistance) was 29.1 percent (or an average reduction of 93 months).  In fiscal year 2011, in production cases in which a below-range sentence was imposed, the average extent of non-government sponsored downward departures and variances was 20.9 percent (or an average reduction of 62 months); the average extent of government sponsored downward departures and variances (other than for an offender's substantial assistance) was 27.6 percent (or an average reduction of 75 months).

Thus, the growing gap in the difference between the average guideline minimums and average sentences imposed in fiscal years 2010 and 2011 is explained by the increased *rate* of below range sentences rather than by an increased *extent* of departures and variances. Furthermore, as noted above, the widening of the gap is somewhat tempered by the substantial number of sentences in production cases at or above the middle of the applicable guideline ranges (including upward departures and variances above the applicable ranges).

**D.    OFFENDER AND OFFENSE CHARACTERISTICS**

This section discusses offender and offense characteristics based on data derived from both the Commission's regular datafile from fiscal year 2010 and the special coding project of fiscal year 2010 production cases.

1.    *Offender Characteristics*

Production offenders, like non-production child pornography offenders, are a relatively homogenous group demographically compared to federal offenders generally.[41]  Among production offenders in fiscal year 2010, the overwhelming majority were male (97.0%), white (85.9%), and United States citizens (97.0%).  The average age of production offenders was 41 years — one year younger than non-production offenders but six years older on average than federal offenders generally.[42]

Also, like non-production offenders, production offenders on average occupy a higher socio-economic status than federal offenders generally.[43]  In fiscal year 2010, 87.7 percent of production offenders were high school graduates, and 46.7 percent had at least some college.  In fiscal 2010, among all federal offenders, the typical offender was *not* a high school graduate (51.4%), and only 19.9 percent of offenders had at least some college education.  There was a high degree of employment among child pornography production offenders at the time of their arrests.  Of the 197 production offenders sentenced in 2010 for which there was employment data, 76.1 percent were employed.  Only 15.2 percent were unemployed, and 8.7 percent were

---

[41]  *See id.* at 142 (noting that the vast majority of non-production offenders are white male U.S. citizens).

[42]  *See id.* at 143 (average age of non-production offenders in fiscal year 2010 was 42 years old).

[43]  *See id.* at 162–63 (comparing education, employment status, and net worth of non-production offenders to federal offenders generally).

not part of the work force because they were retired or either physically or mentally disabled. Production offenders slightly differed in one respect from non-production offenders economically: a majority of production offenders had negative net worth (56.1%) at the time of the presentence investigations in their cases, compared to slightly less than half (47.5%) of non-production offenders.[44] Tables 9–1(a) and 9–1(b) summarize the characteristics of production offenders.

### Table 9-1(a)
### Production Offender Characteristics
### Fiscal Year 2010

|  | Percent (Total of 200 cases) | Mean (in years) |
|---|---|---|
| **Citizenship** |  |  |
| United States | 97.0 |  |
| Other | 3.0 |  |
| **Gender** |  |  |
| Male | 97.0 |  |
| Female | 3.0 |  |
| **Race** |  |  |
| White | 85.9 |  |
| Black | 6.0 |  |
| Hispanic | 7.0 |  |
| Other | 1.0 |  |
| Age |  | 41 |

Note: Of the 207 production cases in fiscal year 2010, seven were excluded for insufficient documentation.
SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10.

### Table 9-1(b)
### Production Offender Characteristics
### Fiscal Year 2010

| Category | Percent (Total of 200 cases) |
|---|---|
| **Education** |  |
| Less than High School Grad | 12.3 |
| High School Grad | 41.0 |
| Some College | 31.3 |
| College Grad | 15.4 |
| **Employment** |  |
| Employed in some capacity | 76.1 |
| Unemployed | 15.2 |
| Retired/Physically or Mentally Disabled | 8.7 |
| **Assets** |  |
| Negative Assets | 56.1 |
| $0 to $9,999 | 26.9 |
| $10,000 to $99,999 | 10.5 |
| More than $100,000 | 6.4 |

Note: Of the 207 production cases in fiscal year 2010, seven were excluded for insufficient documentation.
SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10 and FY10 Child Pornography Special Coding Project.

---

[44] That difference could be explained in part by the fact that a much larger percentage of production offenders were detained without bail before their sentencing hearings (93%) than non-production offenders (57%) — and, thus, lacked employment opportunities and may have lost assets such as houses or cars.

With respect to reported histories of sexual abuse during production offenders' own childhoods, 29.4 percent (58 of 197) reported actual or possible sexual abuse.[45]  By comparison, 17.7 percent of non-production offenders (293 of 1,654) reported that they had been or may have been sexually abused as a child.[46]

Among fiscal year 2010 production offenders, 43.4 percent reported a history of substance abuse.[47]  That figure is higher than the prevalence rate of substance abuse among non-production offenders (35.5%) but appears comparable to, or perhaps even lower than, the rate for federal offenders generally (which appears to be over 50%).[48]

With respect to criminal history, production offenders also differ from the average federal offender and more closely resemble non-production offenders.  As reflected in Figure 9-7 below, in fiscal year 2010, 77.0 percent of production offenders (154 of 200) were in Criminal History Category I.  The criminal histories of production offenders are similar to the criminal histories of non-production offenders — 81.1 percent of R/T/D offenders and 82.2 percent of possession offenders were in Criminal History Category I.[49]  Figure 9–7 below shows the distribution of the various criminal history categories for production offenders in fiscal year 2010.  By contrast, 43.9 percent of all federal offenders were in Criminal History Category I.



**Figure 9-7**
**Production Offender Characteristics:**
**Criminal History Category**
**Fiscal Year 2010 (N=200)**

---

─────────────

[45]  Of those 58 offenders, 12 (20.7%) had their reports of abuse verified by other sources (*e.g.*, offenders' family members).

[46]  *See* Chapter 6 at 156.  As discussed in Chapter 6, the prevalence rate of childhood sexual abuse in the general population is approximately one in six males.  *See id.*  Although the fiscal year 2010 production offenders reported histories of childhood sexual abuse at a rate twice that of the general population, caution should be exercised in making any inferences from the Commission's data.  The numbers of production offenders studied was small (207), and the number of PSRs that contained any type of verification of the offenders' self-reports was small (20.7%).

[47]  Of those 85 offenders, 50 (58.8%) had verified histories of substance abuse.

[48]  *See* Chapter 6 at 185 n.85.

[49]  *See id.* at 143.

Of those production offenders with criminal histories, the vast majority had convictions for sexual contact offenses against adults or children. Of the 197 production offenders for whom relevant sentencing documentation existed, 17.3 percent (34 of 197) had a prior conviction for a sex offense. Of those 34 offenders, 23 (67.7%) had a prior contact sex offense against a child and another 4 (11.8%) percent had a prior contact sex offense against an adult.

As discussed in Chapter 2, USSG §4B1.5 (Repeat and Dangerous Sex Offenses Against Minors) contains two alternative enhancements for certain production offenders' prior criminal conduct.[50] Section 4B1.5(a), which applies if an offender has one or more predicate convictions for a sex offense, provides for enhanced minimum offense levels for production offenders (either level 34 or level 37, depending on the number of an offender's predicate convictions for sex offenses) and a minimum of Criminal History Category V. If an offender's final offense level or criminal history category resulting from a guidelines determination before application of §4B1.5(a) exceeds those in §4B1.5(a), then no additional enhancement would apply. Section 4B1.5(b), which applies if §4B1.5(a) does not apply and if an offender engaged in a "pattern of activity involving prohibited sexual conduct" (whether or not such a pattern resulted in a prior conviction), results in a 5-level enhancement in addition to any enhancements in the specific offense characteristics of §2G2.1. Of the 192 fiscal year 2010 §2G2.1 cases governed by the 2004 or later versions of the guideline and for which the Commission had sufficient documentation, eight offenders (4.2%) received enhanced sentences under §4B1.5(a), and 44 offenders (22.9%) received enhanced sentences under §4B1.5(b). The average sentence for the §4B1.5(a) offenders was 357 months, while the average sentence for the §4B1.5(b) offenders was 351 months.

2.   *Offense Characteristics*

Section 2G2.1 contains a number of enhancements in specific offense characteristics that can substantially raise an offender's guideline range. Figure 9–8 shows the application rates of



**Figure 9-8**
**Production Cases:**
**Application of the Specific Offense Characteristics**
**Fiscal Years 1992-2010**

---
[50] *See* Chapter 2 at 37–38.

three enhancements that have been in the guideline for over a decade.[51] The first enhancement, for production involving a minor under the age of 12 years old or a minor between the ages of 12 and 16 years old, involves a 4- or 2-level increase depending on the age of the victim (presently §2G2.1(b)(1)). This enhancement has existed in some form since the inception of the production guideline in 1987, when it applied only to minors under 12 years of age. The enhancement was expanded three years later also to cover minors between 12 and 16 years of age. Since 1996, this enhancement has consistently applied in approximately 90 percent of cases, as reflected in Figure 9–8. The second enhancement, which has been in §2G2.1 since November 1, 1990, is the enhancement for a defendant's status as the parent, relative, guardian, or person in custody, care, or supervision of a minor (presently §2G2.1(b)(5)). Although in its early years, its rate of application varied widely, in recent years it has been applied more consistently, in slightly more than half of all cases. The third enhancement — for misrepresenting an offender's identity to the victim or using a computer to solicit or entice the victim (presently, §2G2.1(b)(6)) — was added in part on November 1, 1997, and in part on November 1, 2000. By fiscal year 2004, that enhancement applied in 25.9 percent of production cases, and its rate of application has remained relatively consistent thereafter.

Figure 9–9 shows the rates of application for the other three enhancements in the production guideline, which became effective November 1, 2004. These enhancements — for commission of certain types of "sexual acts" or "sexual conduct" (presently, §2G2.1(b)(2)); distribution of the images produced by the offender (presently, §2G2.1(b)(3)); and production of a sado-masochistic or violent image (presently, §2G2.1(b)(4)) — did not apply in significant numbers until fiscal year 2006. Although the enhancement for a sexual act



**Figure 9-9
Production Cases:
Application of the Specific Offense Characteristics
Fiscal Years 2005-2010**

SOURCE: U.S. Sentencing Commission, 2005-2010 Datafiles USSCFY05-10.

---

[51] The application rate data included in Figures 9–8 and 9–9 refer to the number of cases in which particular specific offense characteristics have been applied in a guideline application for one or more counts of conviction in a particular case. Because multiple production counts of conviction are not "grouped" under USSG §3D1.2(d) — unlike non-production counts, which are grouped — there may be multiple guideline applications in a single production case involving different specific offense characteristics (depending on the counts at issue). If a guideline application regarding at least one count in a case involved a particular specific offense characteristic, that case is reflected in the data in Figures 9–8 and 9–9. However, if a particular specific offense characteristic was applied in connection with multiple counts in a single case, that case is only reflected once in the analysis.

There were not more than 50 production cases annually until fiscal year 2000. Thus, the small number of cases in the earlier years depicted on Figure 9–8 makes comparisons between the earlier years and more recent years difficult.

or sexual conduct has applied in a majority of production cases, the other two enhancements (for distribution and production of sado-masochistic images) have applied in less than half of the cases.

### E.    CLASSIFICATION OF PRODUCTION OFFENSE BEHAVIOR

As part of its special coding project of production cases, the Commission examined certain other types of offenders' behaviors related to both their production offenses and any related non-production child pornography offenses. The Commission examined the "offense conduct" sections of presentence reports ("PSRs") in the fiscal year 2010 §2G2.1 cases to enable meaningful classifications of production offenders according to such behavior.[52] The Commission's findings allow for classification of production offenders according to their offense conduct in two ways — first, by the extent of offenders' involvement with the victims of their production activities; and, second, by the extent of offenders' involvement with child pornography generally.[53] Such classifications are not intended to be an exhaustive taxonomy of production offenders; they are used to provide some insight into the types of production offenders being sentenced in federal court beyond that offered by the data concerning the specific offense characteristics discussed above in Part D.

#### 1.    *Extent of Involvement with Victims of Production Offenses*

The Commission examined fiscal year 2010 production cases to determine how often offenders were physically present with their victims when the production occurred or, instead, how often offenders caused the production from a remote location (via the Internet through use of email or a webcam or via cell phones through texting) without being physically present with the victims. In addition, the Commission examined the cases to determine whether offenders engaged in, or aided and abetted other offenders in the commission of, sexual contact offenses against the victims.

With respect to those offenders who were physically present with their victims, the Commission examined the cases to determine whether: (1) offenders either themselves engaged in sexual contact offenses against their victims or aided and abetted other offenders in the commission of such contact offenses (regardless of whether such contact was memorialized in child pornography); or (2) offenders filmed their victims engaging in sexually explicit activities but did not engage in, or aid and abet others in the commission of, any type of sexual contact offense. With respect to those offenders who were not physically present with their victims, the Commission examined cases to determine whether: (1) offenders remotely solicited self-produced sexual images from minors; or (2) offenders remotely aided and abetted other adult

---

[52]  Seven of the 207 USSG §2G2.1 cases from fiscal year 2010 were excluded from the analysis because of insufficient documentation. As is true with respect to the Commission's other coding projects based on PSRs, this coding project is subject to the important limitation that the Commission's data is based only on what was included in the PSRs. Because some PSRs do not include all relevant information concerning offenders' behavior, the Commission's findings may be under-inclusive in some respects. *See* Chapter 6 at 144 n.50.

[53]  Data concerning victim characteristics are discussed below in section F.

offenders with custody of the children in the commission of sexual contact offenses against the children.[54]

Figure 9–10 below shows the results of the Commission's analysis of the fiscal year 2010 production cases regarding three types of offense behavior: (1) production offenders who were physically present with their victims and engaged in contact offense behavior or, if not physically present, remotely aided and abetted other adult offenders in the commission of contact offenses against minor victims; (2) production offenders who were physically present with their victims but did not engage in any contact offense behavior and did not aid or abet others in the commission of a contact offense;[55] and (3) production offenders who were not physically present with their victims during the production offense and did not remotely aid and abet others in sexual contact offenses against minor victims.[56]

**Figure 9-10**
**Production Offender Characteristics:**
**Physical Presence/Contact Victimization**
**Fiscal Year 2010 (N=200)**



Present/Non-
Contact Offense
15.5%
N=31

Not Present/
Non-Contact
Offense
10.5%
N=21

Note: Percentages may not sum to exactly 100% due to rounding. Of the 207 production cases in fiscal year 2010, seven were excluded for insufficient documentation.
SOURCE: FY10 Child Pornography Special Coding Project.

As Figure 9–10 demonstrates, almost three-quarters of production offenders were physically present with their victims or remotely aided and abetted another adult offender in the commission of a sexual contact offense against a minor victim.

---

[54] Such remote aiding and abetting typically occurred when an offender engaged in a "chat room" or email exchange with another adult offender and requested that the latter offender produce child pornography with a child in the latter offender's custody.

[55] This category includes offenders who surreptitiously recorded their victims (*e.g.*, using a hidden camera) but did not touch them in a sexual manner.

[56] This category includes offenders who solicited still images of self-produced child pornography from minors via email or text or who recorded sexually explicit conduct of minors who appeared remotely via webcam.

### 2. *Extent of Involvement with Child Pornography Generally*

The Commission also examined the fiscal year 2010 §2G2.1 cases to determine the extent to which offenders were involved with child pornography generally. Examination of the cases revealed three general types of offenders:

(1)  offenders who memorialized their sexual abuse of children in videos or still images for their own sexual gratification but did not otherwise commit child pornography offenses or engage in related conduct (*i.e.*, they did not collect any *other* child pornography, did not share their self-produced child pornography with others, and otherwise did not engage in child pornography "communities" such as Internet chat rooms devoted to child pornography);[57]

(2)  offenders who self-produced child pornography and added it to their collection of *other* child pornography but did not share their self-produced images with others or otherwise participate in child pornography communities; and

(3)  offenders who self-produced child pornography and either shared their self-produced images with others or otherwise participated in child pornography communities (even if they did not share their self-produced images).

The first type of offender did not possess any other child pornography, did not share his self-produced images, and did not have any communication with other offenders about child pornography or child exploitation. The other two types of offenders actively engaged in other child pornography collecting behaviors in addition to their production offenses; their sexual interest in children transcended the victims of their own self-produced child pornography. The distinction between those latter two types of offenders relates to their degree of involvement with child pornography generally. The second type of offender collected other child pornography but did not share his self-produced images or communicate with other offenders, while the third type of offender took additional steps to involve himself in a child pornography community (by distributing his self-produced images to others or by communicating with other offenders about child sexual exploitation). The second and third types of offenders engaged in behaviors similar to non-production child pornography offenders even though they were sentenced under §2G2.1 rather than §2G2.2.[58] The first type of production offender engaged in behavior that is relatively dissimilar from most §2G2.2 offenders.[59]

---

[57] Child pornography "communities" are discussed in Chapter 4. *See* Chapter 4 at 92–99.

[58] Many USSG §2G2.2 offenders studied by the Commission in its special coding project also may be classified as type 2 or type 3 offenders because their criminal dangerous sexual behavior involved production of child pornography. *See* Chapter 7 at 181 (Table 7–1; noting that 127 of the 1,654 §2G2.2 offenders had also engaged in production offenses). However, those offenders were sentenced under §2G2.2 rather than USSG §2G2.1. *See supra* note 23.

[59] The Commission's tripartite classification of production offenders reflects a "snapshot" view of offenders based on the description of their behavior in PSRs. The Commission does not intend to imply that a production offender who fits within one of the three categories at a given point in time (*i.e.*, at the time of their arrest on the instant federal offense) would have always remained in that category absent intervention by law enforcement.

**Figure 9–11**
**Production Offender Characteristics:**
**Involvement with Child Pornography**
**Fiscal Year 2010 (N=200)**

■ Only Possessed Self-Produced Images

■ Possessed Self-Produced Images and Other CP

▨ Distributed Self-Produced Images or Otherwise Participated in a CP "Community"



Note: Percentages may not sum to exactly 100% due to rounding.  Of the 207 production cases in fiscal year 2010, seven were excluded for insufficient documentation.
SOURCE: FY10 Child Pornography Special Coding Project

Figure 9–11 above shows the results of the Commission's special coding project of fiscal year 2010 §2G2.1 cases with respect to these three categories of production offenders.  As Figure 9–11 demonstrates, among the fiscal year 2010 §2G2.1 offenders, there were roughly equal numbers of the three types of offenders discussed above.

**F.    VICTIM CHARACTERISTICS**

As noted above, a victim's age is a factor that is incorporated into the guideline calculation in §2G2.1(b)(1).  Although this enhancement is divided into two age brackets (less than 16 years old and less than 12 years old), a substantial number of victims were much younger than 12 years old.[60]  In 49 of 197 cases (24.9%) where sufficient documentation of the victims' ages existed, the victim was five years of age or younger.[61]  In 14 of the 197 cases (7.1%), the victim was two years of age or younger.  Figure 9–12 below includes a complete analysis of the victims' ages.

---

[60]  Although USSG §2G2.1(b)(1) does not include an incremental enhancement for very young victims, the "vulnerable victim" enhancement in subsection (b)(1) of USSG §3A1.1 (Hate Crime Motivation or Vulnerable Victim) may apply to such victims.  *See* Chapter 2 at 35 (discussing Ninth Circuit cases applying the enhancement to child pornography cases involving very young victims).  However, most courts in production cases involving very young victims have not applied this enhancement.  Of the 49 fiscal year 2010 §2G2.1 cases involving victims under six years of age, offenders in only three cases (6.1%) received an enhancement under §3A1.1(b)(1) based on a finding that the victim was a "vulnerable victim."

[61]  This analysis is based on the age of victims when the photographed or filmed abuse first began, as determined from court documents.  In cases where there was more than one victim in a single case, the age of the youngest victim is reported.

*United States Sentencing Commission*

**Figure 9-12**
**Production Offense Characteristics:**
**Age of Youngest Victim at Time of Offense**
**Fiscal Year 2010 (N=197)**



Note: Percentages may not sum to exactly 100% due to rounding. Of the 207 production cases in fiscal year 2010, ten were excluded for insufficient documentation.
SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10 and FY10 Child Pornography Special Coding Project

In addition to victims' ages, the number of victims per case is a factor incorporated into the guideline calculation in §2G2.1(d).[62] As Figure 9–13 shows, the majority of cases had a single victim (122 of 197, or 61.9%).

**Figure 9-13**
**Production Offense Characteristics: Number of Victims**
**Fiscal Year 2010 (N=197)**



Note: Percentages may not sum to exactly 100% due to rounding. Of the 207 production cases in fiscal year 2010, ten were excluded for insufficient documentation.
SOURCE: U.S. Sentencing Commission, 2010 Datafile, USSCFY10 and FY10 Child Pornography Special Coding Project.

---

[62] *See supra* notes 18 & 19 and accompanying text.

The victim-offender relationship also is relevant under §2G2.1(b)(5), as discussed above. As shown in Figure 9–14 below, a large majority of offenders in fiscal year 2010 production cases were known to their victims; over two-thirds (68.4%) were related to their victims, were a family friend, or were a person in a position of trust relative to the victim.  Chat room acquaintances represented 14.3 percent of offenders, but appeared in two distinct forms.  Either the offenders solicited explicit pictures from juveniles in Internet "chat rooms" or through social media, or they groomed their victims through social media or chat rooms and then attempted to meet the victim.  Offenders were strangers to their victims in only a small percentage (7.1%) of cases.

**Figure 9-14**
**Production Offense Characteristics:**
**Offender-Victim Relationship**
**Fiscal Year 2010 (N=196)**



Note: Percentages may not sum to exactly 100% due to rounding.  Of the 207 production cases in fiscal year 2010, eleven were excluded for insufficient documentation.
SOURCE:  U.S. Sentencing Commission, 2010 Datafile, USSCFY10 and FY10 Child Pornography Special Coding Project

Over two-thirds (70.3%) of production cases involved only female victims in fiscal year 2010; 22.1 percent of cases involved only male victims; and 7.7 percent involved victims of both genders.  Cases with only male victims were more likely to have multiple victims than cases with only female victims.  In fiscal year 2010 production cases, 41.9 percent of cases with only male victims had multiple victims, while 29.2 percent of cases with only female victims had multiple victims.

## G.   CONCLUSION

The Commission's study of production cases from fiscal year 2010 yields the following conclusions:

- In the same manner as federal non-production cases, the number of federal production cases has steadily grown during the past two decades, although such cases constituted a very small percentage (0.25%) of the federal criminal docket in fiscal year 2010.  There were over eight times as many non-production prosecutions as production prosecutions in fiscal year 2010.

- In fiscal year 2010, the average prison sentence for production offenders was over 22 years (269.1 months), which represents a near doubling since fiscal 2004, the first year after the PROTECT Act (when the average sentence was 153.4 months) and a four-fold increase since 1992 (when the average prison sentence was 63.5 months).  Average sentences steadily increased during the past two decades as a result of several amendments to both the penal statute and sentencing guideline governing production cases.

- In fiscal year 2010, the vast majority of production offenders sentenced under §2G2.1 (83.8%) were convicted under 18 U.S.C. § 2251, which, since the PROTECT Act, has carried a mandatory minimum prison sentence of 15 years.

- In fiscal year 2010, the average sentence for production offenders was approximately twice as long as the average sentence for offenders convicted of R/T/D offenses and approximately four times as long as the average sentence for offenders convicted only of possession.

- Downward variances and departures for reasons other than a defendant's substantial assistance to the authorities have steadily increased since *Booker* in production cases.  In fiscal year 2004, 84.0 percent of production offenders received sentences within the applicable guideline ranges.  By fiscal year 2010, 56.8 of production offenders received within range sentences, while 35.9 percent received below range sentences (excluding substantial assistance departures); by fiscal year 2011, 50.4 percent of production offenders received within range sentences, while 38.1 percent received below range sentences (excluding substantial assistance departures).  In fiscal year 2010, in production cases in which a below-range sentence was imposed, the average extent of non-government sponsored downward departures and variances was 24.5 percent (or an average reduction of 64 months); the average extent of government sponsored downward departures and variances (other than for an offender's substantial assistance) was 29.1 percent (or an average reduction of 93 months).  In fiscal year 2011, in production cases in which a below-range sentence was imposed, the average extent of non-government sponsored downward departures and variances was 20.9 percent (or an average reduction of 62 months); the average extent of government sponsored downward departures and variances (other than for an

*United States Sentencing Commission*

Letter Written by Nicholas Andres Gonzales-Malven

EXHIBIT B

Honorable Senior District Judge David A. Ezra,

First and foremost I want to apologize to the victim, and the family of the victim. I completely failed the victim when I should have been the one who helped him grow, to show him compassion and empathy in a seemingly other-wise cruel world. Rather, I acted as an agent of that cruelty. My actions were utterly irresponsible, immoral, and a complete abuse of authority. I betrayed the trust of the victim by violating his personal space and privacy. I crossed a boundary that should have never been crossed. I fear now that my be-trayal will be a constant hinderance in the establishment of future, healthy relationships for the victim. I regret the wrong-doing I committed, and causing the victim and his family pain and suffering. I understand the severity of my actions; the ill-effects they have caused; and the effects they will continue to produce in everyone involved. :

I also want to apologize to all my loved ones for all the heartache and distressing situations that my actions have put them through. It upsets me to know that my actions have put them through afflictions for which I am the sole cause, and I regret it deeply. I regret the pain that I put them through, and losing precious time together. Though I cannot give them that lost time back, my time away has not been in vain for I have been working on bettering myself. I hope to return in kind the love and support my loved ones have been giving me since the first day I became incarcerated.

Not only did I betray the victim, my family, and co-workers, I also betrayed the aspirations I held, and my belief in humanity. Since my incarceration - July 29, 2016 - I have been contemplating my moment for redemption so that I may prove I can be a disciplined and responsible member of society. I know I will, from here on out, be

judged by my actions of the past, but I refuse to believe that I no longer have a place where I can make a positive in my community.

Your Honor, I understand that a judgement must be passed on to me. I do ask you that whatever judgement you declare may it be fair and with consideration that, before I walked down that dark path, I had great respect and care for all others. All my life I have worked hard from throughout high school, in my service to the United States Navy, which discharged me based on my sexual orientation, and throughout college, where I attained my associates degree.

In the few days leading up to being detained I was diagnosed with H.I.V. Having HIV, along with being locked away, has given me an enlightened perspective on life, a greater respect for others and self, and a great appreciation for everything life has to offer including that which is deemed mundane. I have also developed an increasing desire to have a meaningful life, which I've come to perceive as devoting myself to loving others, devoting myself to my community around me, and devoting myself to creating something that gives me purpose and meaning.

So once more, I ask of you to please be even handed and lenient in the judgement you must give me.

Respectfully,

Nicholas A. Gonzales-Malven

**Family Letters**

**EXHIBIT C**

To whom it may concern,

My name is Angelina Antuna, and I am the older sister of Nicholas Gonzales-Malven.

When I became aware of my little brother's situation, I was overcome with extreme shock. Shock, because this was not the character of my brother. He has always been soft spoken, respectful, non-confrontational and never had a thought of injuring anyone. Nicholas was never involved in trouble in school. Even as an adult, he never so much as was issued a traffic citation. Nicholas, growing up, was a very imaginative, caring and sensitive child. He was a typical little boy who played with cars, legos, and his favorite, dinosaurs. With 8 years in age between us, Nicholas was my pesky little brother. He, however, had the biggest heart, and would smile ear to ear whenever I would agree to join in his imaginative playtime.

From the time he was born, we attended church every Sunday morning and Wednesday night. Nicholas joined the Royal Rangers, which is a Boy Scout type of organization through the church. Every Wednesday night during church service, Nicholas would attend the Royal Rangers' meetings. It wasn't necessarily because he wanted to go on the camping trips and outings. Nicholas was in search of a friend. You see, Nicholas was a very caring and loving child, and, with those character traits, carried a deep sensitivity which, unfortunately, made him a target of ridicule and bullying. Nicholas was not an athletic child, and attending the small Christian school we did, if you were not an athlete, you were shunned by the cliques, bullied, or, if you were lucky, unnoticed entirely. Nicholas was bullied relentlessly. I watched his, once joyous light, begin to dim every time he came home from school. I watched as he cried to my mother and asked her to pray with him that God would send a friend his way. I watched this occur for years until about his Junior year in high school. During that time, Nicholas found his voice by joining a debate team. Through that, he gained a mentor in his debate teacher, and friends in his teammates. He even had a girlfriend. Finally, God had answered his prayers.

From that time going forward, Nicholas just started thriving. He got the lead in a school play, enjoyed time with his friends and girlfriend, and even developed a close bond with someone who became his best friend. After Nicholas graduated high school, he spoke to me about his desire to help people, especially children. He wanted to be a mentor to children the same way he was mentored by his debate teacher. Nicholas decided he wanted to get his degree and become a teacher. Before he persued his degree in education, Nicholas made the decision to join his best friend in signing up for the Navy. Shortly after graduation, he was off to start his journey in the military.

The Navy was a struggle for my brother to say the least. Here, this non-athletic young man, who couldn't swim, was enlisted in the Navy. But he never gave up, always asking my mother to keep him in her prayers. The struggle to learn how to swim and the physical aspects of the service were nothing he couldn't handle though. It was being treated like an outcast due to his non-athleticism and caring, naive, sensitive demeanor. Even his best friend began to shun him. It seemed as though history was repeating itself. Nicholas was also struggling with a bigger issue. The fact that he was gay. I was the first in our family in which he confided. He mentioned in our conversation of him coming out, that maybe this was why he was always so dicarded by others. That maybe they knew even when he didn't. Growing up in a Christian church and school, we were taught being gay was not of God. So it became a source of fear for Nicholas, especially having to come out to the rest of our family. Ultimately, him being gay, is what caused him to be honorably discharged from the Navy during the time of 'Don't ask, don't tell'.

This setback, however, led Nicholas to what he called his home for 10 years, Bellingham, Washington. While in Washington, Nicholas began to find his stride again. He began to attend community college to gain his degree in education, tried to meet people and gain new friends, tried to gain an understanding of who he was as a gay man, and also gained a boyfriend whom with he shared an apartment. Nicholas enjoyed hiking, camping, riding around town on his bicycle and just viewing nature. He gained a community of friends with whom he shared like interests and intellectual conversations. There were common life setbacks throughout the years such as breakups, loss of friendships and financial struggles, but through it all, Nicholas remained positive. No matter the situation, Nicholas never focused on the

negative. He worked little part-time jobs, such as washing dishes in a pizza parlor, but he wanted to do much more for his community. He spoke to me about wanting to found a gay support group. He wanted to help individuals such as himself who may be struggling coming to terms with their sexuality or coming out to their families. He said he just had a strong desire to help people. And so he started looking into attending Humanity classes. While during that process, he worked at the YMCA and a local daycare. He spoke of the kids in his class with fondness. Nicholas enjoyed teaching them and the idea that he was intricate in their molding and development. He was constantly praised by the rest of the teaching staff, his superiors and especially the parents of the children. Never was there a negative word spoken of Nicholas during his time as a daycare teacher. It was a disappointment to the staff and parents when Nicholas decided it was time to come back home to San Antonio, yet it was a pray answered for my mother.

Nicholas was excited to come back home, as we all were as a family. Nicholas planned to continue his education at Palo Alto or NW Vista community college, gain employment and become a productive member of his community. During the short time he was home, Nicholas gained a boyfriend, reconnected with old friends and gained employment. He was positive his life back home was coming together, and optomistic about his future. He was also excited about the fact that he was making new friends and feeling accepted. Something Nicholas struggled with for years. Unfortunately, one of those new friends did not have Nicholas' best interest at heart.

Although, we as a family have been living in unbelievable pain and fear due to this situation and the possible outcomes, especially dealing with the media, their false exaggerations to make their story better and earlier threats from the community, we fully understand that Nicholas must face a consequence. However, I don't want to believe that my brother finally came home, only to spend his life behind bars. I have you in my prayers because I know determining the fate of someone else's life must be a heavy cross to bear, and I thank you for taking the time to read my letter and gain a better understanding of my little brother's life and character.

Sincerely,

Angelina Antuna

To whom it may concern,                    1-15-18

    I love my brother, I love him very much. He has always been, to me, my best friend, the one person I can always count on to be there. For me, the one person I always enjoyed & anticipated the times I would have to hang out with him. Nick is a good person, he is a loving person, a carrying person. When he joined the Navy, it damn ~~sure~~ near broke" my heart.

    I would write him multiple letters & wait eagerly for his next letter. It seems these days, history is repeating itself in a weird way. Nick is truly a good person with an even greater heart. I don't honestly know who this may concern or who even truly cares, but as a brother who loves his brother, it concerns me deeply & I truly care. I love my brother with all my heart. ████████████████████

            - Nate Malvern

Nicholas has always been a thoughtful considerate person. He has always enjoyed helping family and friends. He extended this concern to others when he joined the Red Cross because he wanted to help in disaster relief efforts when he lived in Washington.

He has enjoyed reading his whole life over a wide range of subjects from health and fitness, science, history, social and political issues.

He has always tried to be an independent, self-sufficient person as well. He takes a great interest in cooking meals — especially healthy nutritious foods.

I am pleased to note that Nick also has apparently inherited our family's creative streak. He has shared some of his poetry with me.

In closing I would ask for mercy and leniency for my son.

R Brian Malvey

Robert Brian Malvey